RUGO CONST. CO., Inc. v. NEW ENGLAND FOUNDATION CO., Inc.

No. 4375.

United States Court of Appeals
First Circuit.

Feb. 28, 1949.

James G. Fay, of Boston, Mass., for appellant.

Seymour P. Edgerton, of Boston, Mass. (Miles Wambaugh and Bingham, Dana & Gould, all of Boston, Mass., on the brief), for appellee.

Before MAGRUDER, Chief Judge, WOODBURY, Circuit Judge, and PETERS, District Judge.

WOODBURY, Circuit Judge.

This is an appeal from a final decree entered in a libel in admiralty brought by

the owner of a derrick lighter against her demise charterer to recover damages resulting from the sinking of the lighter. There is no longer any dispute over the essential facts.

The libellant-appellee, New England Foundation Company Incorporated, purchased the lighter involved on April 10, 1941, for $6,300. It took out hull and collision insurance on the lighter; had it repaired (as a result of which it was put into excellent condition) and slightly altered, at a cost of $1,216.81, and then it used the lighter in the performance of a contract which it had with the Bureau of Yards and Docks of the Navy Department for the construction of two piers at the Navy Yard in South Boston. In this employment the libellant received $2,409.50 as rental for the lighter. On August 28, 1941, the libellant, having no further immediate use for the lighter in its own work, chartered it on the bare boat basis at a rental of $800 per month to the respondent, Rugo Construction Company, Inc. The latter used it until October 15, and then returned it to the libellant, but on November 5, Rugo chartered the lighter again on the same basis as before except that the hiring was by the month without "split months."

During the night of December 3, 1941, while the lighter was under the control and in the possession of the respondent under this second charter, it sank in the crash boat slip at the Naval Air Station at Squantum, Massachusetts, where the respondent, in the performance of a contract which it had with the Navy Department, had been using the lighter for pulling piles, work for which she was properly fitted and in which she was expected to engage. It has been found, and it is now conceded, that the lighter was seaworthy and in good condition before she sank, that she had been tied up for the night of December 3, in the crash boat slip on orders of a representative of the Navy Department, and that the crash boat slip was a clear berth.

On the day following the sinking the libellant's president and a marine surveyor employed by the company carrying the insurance on the lighter went to Squantum to examine the wreck. They found the lighter lying on the bottom of the slip with her bow in shore and out of water but her stern submerged and her decks awash even at low tide. Although it was impossible as the lighter lay to go aboard her or even for a diver to observe the extent of the damage to her hull, the marine surveyor, with the knowledge and approval of the libellant's president, made arrangements for and later supervised the work of raising her. This work was begun immediately, but it proceeded slowly, because with the outbreak of hostilities there were frequent demands by the Army and Navy for the equipment and personnel engaged therein. Then, from January 8 to February 23, 1942, the lighter was iced in at the slip and all work upon her had to be temporarily abandoned. However, early in March she was raised by means of slings placed under her bottom and supported by other lighters she was removed to a marine railway in Chelsea where she was hauled out of the water and where for the first time it became possible to make a complete examination of her hull.

This examination disclosed that in addition to the loss of most of her superstructure caused by floating ice and damage to her machinery caused by submersion, her bottom planking, which was sound and free from rot, had eleven holes in it, apparently caused by her having settled on submerged piling in the bottom of the crash boat slip, and that she needed re-caulking. Temporary repairs costing $331.11 were made to the lighter while it was on the marine railway so that she could be floated away from it, and when that was done she was tied up to a nearby wharf. While there she was examined by a marine surveyor other than the one who had arranged for and superintended her salvage who estimated that it would cost $10,000 to restore the lighter to the condition in which she had been before she sank. The libellant did not have her repaired, however, but some four months later sold her in "as is and where is" condition for $750.

On these facts the court below concluded that the "libellant was entitled to a decree against the respondent for its damages" and entered an interlocutory decree referring the libel to a Commissioner to ascertain the amount of those damages. The Commis-

sioner held hearings, at which only the libellant offered testimony, as a result of which he found that although it was impossible while the lighter lay on the bottom of the crash boat slip to tell what damage it had sustained "the raising of her was justified to find out her condition"; that $6,-345.90 had reasonably and properly been expended in raising the lighter, moving her to the marine railway and hauling her out for inspection; that $331.11 had reasonably and properly been spent in making temporary repairs to the lighter while she was hauled out "so she would float when launched from the railway"; that it would cost $10,000 to make permanent repairs to the lighter; and that the value of the lighter at the time she sank was "more than the cost of the repairs." On the basis of these findings the Commissioner ruled that the lighter was a partial loss and under applicable principles of law the libellant was entitled to recover as damages (1) the expense of raising the lighter, removing her to the railway, hauling her out, etc., in the amount of $6,345.90, (2) the expense of the temporary repairs made to the lighter while it was on the railway in the amount of $331.11, and (3) the estimated expense of permanent repairs in the amount of $10,000, making a total of $16,-677.01. But the Commissioner ruled that the $750 the libellant had received for the lighter should be deducted from this amount and in consequence found the libellant's damages to be $15,927.01.

When this report came in the libellant moved in the court below for its confirmation, and the respondent for recommittal to the Commissioner. The court below after hearing on these motions, found "no substantial basis to justify" the conclusion that the lighter was worth at least $10,000 at the time she sank. But it sustained the other findings and conclusions of the Commissioner, and, determining that the value of the lighter when she sank was $7,500, it deducted $2,500 from the gross award made by the Commissioner and as so modified confirmed his report. Thereupon the court below entered a final decree for the libellant in the amount of $13,427.01, with interest thereon of $4,905.53 plus costs taxed at $931.62, making a total of $19,-264.16, upon which it awarded interest from the date of the decree, and the respondent thereupon took this appeal.

The respondent now concedes that it was reasonable to commence salvage operations on the lighter, and that $6,345.90 was a reasonable amount to expend for that work. Its contention is that the libellant is not entitled to recover that amount as an item of its damages, however, because in fact the costs of salvage were not borne by the libellant but were paid by its insurance carrier on its own responsibility and in pursuit of its interest to avoid payment of a total loss. And furthermore the respondent contends that since the court below found that the value of the lighter when it sank was less than the cost of repairing it, i. e., that it was a total loss, the libellant cannot recover the cost of the temporary repairs ($331.11) made to the lighter while it was on the marine railway. We do not agree with either contention.

Perhaps discussion of these contentions, as well as discussion of two of the three contentions advanced by the libellant-appellee in its cross-assignments of error, which we shall consider later in this opinion, can best be introduced by the statement (or restatement) of certain old and firmly established principles of the law of damages, which, although developed for the most part in cases arising out of collisions at sea, are concededly applicable to cases like the one at bar.

The underlying principle established by the cases is to limit a ship owner's damages to the amount of his actual loss. "Restitutio in integrum is the leading maxim in such cases." The Baltimore, 8 Wall. 377, 385, 19 L.Ed. 463. Thus in cases of obvious total loss, as when a vessel is sunk in deep water and either cannot be raised at all or can only be raised at a cost clearly in excess of her value, or when a vessel, although sunk in shallow water, is obviously so badly damaged that the cost of repairing her will clearly exceed her value at the time she sank, the owner's recovery is limited to the fair value of the vessel at the time of the loss to which interest may be added to afford complete indemnity. The Baltimore, supra; The Fal-

con, 19 Wall. 75, 79, 15 L.Ed. 43; The Havilah, 2 Cir., 50 F. 331.

 Mere evidence, however, that a damaged vessel is sunk is not enough to show that the vessel is a total loss. The Baltimore, supra, 8 Wall. at page 386, 19 L.Ed. 463; The Havilah, supra, 50 F. at page 333. Application of the basic principle of damages involved does not permit the owner of a vessel sunk in shallow water under circumstances indicating that she might readily and relatively inexpensively be raised and repaired, to abandon his vessel and treat it as a total loss, in effect to sell her at her fair value at the time of the sinking to the one liable for the loss. In the case of a probable partial loss the law requires the owner by "reasonable exertions" and "the use of such nautical skill as the owners of vessels usually employ in such emergencies" The Baltimore, supra, 8 Wall. at page 387, 19 L.Ed. 463, to mitigate his damages by raising his vessel and having her repaired, and in this event the owner's damages "include the expense of raising the vessel and putting her in repair, with a proper allowance for the loss of freight and for the damage to the cargo, and for the detention of the vessel during the time necessary to make the repairs and fit the vessel to resume her voyage." Id. See also The Reno, 2 Cir., 134 F. 555, 556; and O'Brien Bros. v. The Helen B. Moran, 2 Cir., 160 F.2d 502, 504, and cases cited.

 Another situation sometimes arises, and it has arisen in the case at bar, in which the vessel is sunk in shallow water under circumstances indicating that she can easily and relatively cheaply be raised, but until that is done it cannot be determined whether the combined costs of raising and repairing the vessel will equal or exceed her value at the time of the sinking or whether they will not. In this situation it is incumbent upon the owner to raise his vessel, and also to remove her to some other place, if that be necessary to determine the extent of the damage she has sustained, and in this event he is entitled to recover from the tortfeasor his reasonable expenses of raising and removal in addition either to the fair value of his vessel, if she eventually proves to be a total loss, or to the reasonable cost of repairing her, etc., if she eventually proves to be only a partial loss. The Reno, supra, 134 F. at page 554, cited with approval in O'Brien Bros. v. The Helen B. Moran, supra, 160 F.2d at pages 503, 504. And in partial loss cases the owner does not have to repair in order to collect the damages which the law in such cases allows. "One whose ship is wrongfully injured, as against the wrongdoer, may liquidate his damages by expert testimony alone, and never repair at all," and furthermore "the making of temporary repairs does not preclude a libelant from recovering cost of permanent repairs." Pennsylvania R. Co. v. Downer Towing Corporation, 2 Cir., 11 F.2d 466, 467. See also The Havilah, supra, 50 F. at page 334.

Applying these principles to the established facts it is evident that the expenditure of $6,345.90 to raise the lighter from the bottom and remove her to the marine railway for inspection, an expenditure which the respondent now concedes was reasonably incurred, and reasonable in amount, would certainly constitute an item of the libellant's damages recoverable from the respondent had it been made by the libellant itself. But the respondent contends that the libellant cannot be allowed to recover those costs when in fact they were assumed and paid by the libellant's insurance carrier exclusively, so it says, for the protection of its own interest to avoid payment for a total loss.

 The contention fails for as already appears the costs had to be undertaken in an effort to mitigate the libellant's damages, if its cause of action was to be preserved, and hence their payment by the insurance carrier was in the interest and on behalf of the libellant despite the fact that the insurance carrier may also have hoped to gain something for itself thereby. In fact, the trial court found "that the Insurance Company, through Captain A. L. Kent, a marine surveyor, arranged and supervised the subsequent activities in raising the lighter, with the knowledge and approval of libellant". Furthermore to deny the libellant recovery of the cost of raising the lighter, which as we have seen

are elements of damages, would be to give the respondent the benefit of the libellant's insurance, and this would do violence to the long established principle that one whose ship has been lost or damaged by the fault of another may nevertheless recover his damages from the wrongdoer even though in fact he has received compensation for his loss from his insurer. See The Propeller Monticello v. Mollison, 17 How. 152, 154, 15 L.Ed. 68; The Atlas, 93 U.S. 302, 310, 23 L.Ed. 863; and The Potomac, 105 U.S. 630, 634, 26 L.Ed. 1194, in which, citing many authorities, the court said: "The mere payment of a loss by the insurer does not indeed afford any defense, in whole or in part, to a person, whose fault has been the cause of the loss, in a suit brought against the latter by the assured. But upon familiar principles, often recognized by this court, the insurer acquires by such payment a corresponding right in any damages to be recovered by the assured against the wrong-doer, or other party responsible for the loss, and may enforce this right by action at common law in the name of the assured,' or, when the case admits of proceeding in equity or admiralty, by suit in his own name." The rule was clearly and succinctly expressed by Judge Clark, dissenting on other grounds in Agwilines, Inc. v. Eagle Oil & Shipping Co., 2 Cir., 153 F.2d 869, 873, in the statement:

"For in admiralty, as well as at law, there is no more solidly established principle than that payments or reparations of whatever nature which the injured party receives from a collateral source are, in the words of the courts, res inter alios acta, of no concern to the wrongdoer. * * * This has been held true of compensation from an insurace company."

It will suffice to say in concluding this part of our opinion that the cases relied upon by the respondent, The Venus, D.C., 17 F. 925; Galveston Towing Co. v. Cuban S. S. Co., 5 Cir., 195 F. 711; The Priscilla, 1 Cir., 55 F.2d 32 are not in point for in all of them recovery was sought, but not permitted, for expenses incurred by an insurer for the protection of interests peculiarly its own, as distinguished from expenses incurred by an insurer for the protection not only of its own interests but also for the protection of interests of its insured.

The respondent's other contention is that the District Court, after it found that the value of the lighter was less than the cost of repairing it, ought to have eliminated the cost of the repairs made to the lighter when it was on the marine railway from the libellant's damages. The argument is that by reducing the value of the lighter to $7,500, $2,500 less than the estimated cost of permanent repairs, the court below made the case one of total loss, instead of one of partial loss as the Commissioner had held, and that by doing so the court automatically limited the libellant's damages to the value of the lighter at the time she sank with interest thereon, thereby necessarily eliminating all items of repair from the libellant's recoverable damages.

The respondent's position is untenable in view of the finding by the Commissioner, adopted by the court below and now conceded, that it was not only reasonable to raise the lighter and have her hauled out for inspection but also that "it was both reasonable and necessary to have her temporarily repaired while hauled out so she would float when launched from the railway." These findings make the cost of the temporary repairs amounting to $331.11 not only a natural and logical, but even a necessary part of the salvage operation, and for this reason it constitutes, under the principles enunciated above, an element of the libellant's recoverable damages whether the lighter proved to be a total or only a partial loss. For this reason the court below correctly let this item remain in the libellant's damages.

The libellant by cross-assignments of error, contends: 1. That the District Court erred in its ruling that the evidence introduced before the Commissioner afforded an insufficient basis for his finding that the lighter was worth more than the cost of repairing her, and erred again in finding that the value of the lighter at the time of the sinking was $7,500, and hence less than the cost of permanently repairing it. 2. That the District Court erred in sustaining the Commissioner's ruling excluding from evidence certain parts of the Final Statement of Rented Construction

Equipment made by the Bureau of Yards and Docks, Navy Department, to the respondent upon the completion of its contract with the Bureau in which the appraised value of the lighter when received is set out as $25,000. 3. That the District Court erred in sustaining the Commissioner's ruling deducting $750, the amount for which the lighter was sold, from the libellant's damages.

The evidence which the libellant chose to introduce before the Commissioner on the issue of the value of the lighter at the time she sank is far from exhaustive. All that was made to appear was the libellant's investment in the lighter (initial cost plus alterations and repairs) amounting in all to $7,516.81 and the lighter's earnings during the spring, summer and fall of 1941, both while it was in use by the libellant itself and while it was under charter to the respondent. We do not think that the court below erred in concluding that this fragmentary evidence was insufficient to warrant the Commissioner's conclusion that the lighter was worth more when she sank than the cost of repairing her thereafter. The libellant having alleged a partial loss assumed the burden of persuasion on that issue, but even if we take judicial notice of some appreciation in the value of lighters during the eight months preceding December 3, 1941, due to the preparations for war then being made, we do not think that the libellant sustained its burden merely by evidence of the gross, not, it is to be observed, the net, earnings of the lighter in question during that period. Large as these earning were, we do not think that standing alone they afford a sufficient basis for the assumption that the lighter had appreciated approximately a third in value during that brief interval of time. In view of the reluctance of appellate courts, even in admiralty, to disturb findings of fact made below, we feel that on the meager evidence presented the finding of the District Court as to the value of the lighter must be sustained.

Nor do we think the Commissioner and the court below erred in excluding from their consideration the parts of the Navy Department's Final Statement of Rented Construction Equipment in which an appraised value of $25,000 was placed upon the lighter. "There is no evidence" as the Commissioner pointed out, as to "who made the appraisal, or how, or on what basis it was made", and hence there is no basis for treating the appraisal as an admission of value by the respondent, as the libellant contends. And it is without probative value anyway since there is nothing to indicate that it was made without motive to inflate, by a competent expert, after a serious appraisal.

We need not inquire whether the Commissioner, having found a partial loss, was correct in deducting the amount for which the libellant sold the lighter from its damages. The District Court having determined, as we think correctly, that the lighter was a total loss was clearly correct when assessing damages in deducting the amount for which the libellant sold the wrecked lighter from its value at the time of the sinking for otherwise the libellant would recover more than its actual loss. See O'Brien Bros. v. The Helen B. Moran, supra, 160 F.2d at page 506 and cases cited.

The judgment of the District Court is affirmed with costs in this court to the libellant-appellee.